## Kneass et al. v. City of Philadelphia et al.

*City Commissioners—Power to employ architect to prepare plans and specifications for Municipal Court building—Acts of June 1, 1885, April 19, 1895, July 12, 1913, and June 25, 1919.*

1. Under clause 2 of section 3 of the Act of July 12, 1913, P. L. 711, creating the Municipal Court, the duty of providing proper accommodations for the court is imposed upon the City Commissioners, and they may, therefore, employ their own architect to prepare plans and specifications for the Municipal Court building.

2. The duties thus imposed upon the City Commissioners are consistent with the duties imposed upon them by the Act of April 15, 1834, P. L. 539, and the system in existence before the passage of that act. The system was not affected by the Act of June 1, 1885, P. L. 37, 42, or the Act of June 25, 1919, P. L. 581, the former of which provides that public buildings in cities of the first class are to be constructed under the direction and control of the Department of Public Works; and the latter that plans and specifications for public buildings are to be made by the City Architect, or under his supervision, as these statutes apply only to municipal buildings, and the Municipal Court is a court of the Commonwealth and not of the municipality; and, hence, the construction of its court-house is not within the Acts of 1885 or 1919.

3. As the City Commissioners, in constructing the court-house in question, act under the authority conferred by the Act of July 12, 1913, P. L. 711, it is unnecessary to obtain the approval of two successive grand juries and the Court of Quarter Sessions as a condition precedent to its construction as required for the erection of county buildings under section 10 of the Act of April 15, 1834, P. L. 539.

4. Under the Act of April 19, 1895, P. L. 38, it is the duty of the City Commissioners to submit the plans, specifications and draft of the contract for the approval of the judges of the Courts of Common Pleas before entering into the contract for the construction of the building.

Taxpayers' bill to restrain alleged illegal payment of public money. C. P. No. 4, Phila. Co., June T., 1921, No. 8338.

*George G. Chandler* and *Owen J. Roberts,* for plaintiffs.

*William T. Connor,* for City Commissioners.

*Francis Shunk Brown* and *F. B. Bracken,* for John T. Windrim.

AUDENRIED, P. J., April 18, 1922.—It appears from the bill that by a series of ordinances the Council of the City of Philadelphia has appropriated large sums of money to the City Commissioners of Philadelphia to enable them to provide plans for a court-house for the use of the Municipal Court of Philadelphia and to begin the construction of that building. The bill avers also that these defendants have employed the defendant, John T. Windrim, as architect to prepare the plans for the court-house and to superintend the building of it, although he is not the official architect of the City.

On the ground that these appropriations are illegal, the plaintiffs, who are taxpayers of the City, pray that payment of the moneys so appropriated be enjoined. They allege that the proposed court-house is a public building; that in the case of a city of the first class (to which Philadelphia belongs) the law imposes on the Department of Public Works the duty of building all such structures, and requires that the planning of them and the supervision of their construction shall be committed to the City Architect, or, under certain circumstances, to a specially employed architect appointed by him, with the approval of the Mayor; and that, therefore, the delegation of this work to the City Commissioners and their employment of Mr. Windrim as architect are without lawful authority and would involve a misuse of the City's funds.

The commissioners and Mr. Windrim have demurred to the bill. The demurrants insist that the legislation which assigns to the Department of Public Works in cities of the first class the duty of erecting public buildings

does not apply to the contemplated court-house; that the task of providing suitable accommodations for the Municipal Court is imposed by law on the City Commissioners as representatives of the County of Philadelphia, and not on the City of Philadelphia; that there is no legal reason why the planning of the court-house and the superintendence of the work of building it should be left to the City Architect; and that, therefore, the case laid in the bill does not call for intervention by this court.

In order to decide properly the questions of law raised by the demurrers, it is first necessary to consider the peculiar administrative system which has been established for the government of Philadelphia and its people. This, like all institutions, is the result of growth and decay. No real institution was ever devised on the instant and established by a single stroke of the pen, no matter how able the minds engaged in the attempt. The government of Philadelphia is rooted deep in the past; and, however imperfect and clumsy it may seem, we may well question whether its very complexity does not afford a greater measure of protection for the persons and property of the people against ill-considered experiments and the passing fancies of the mutable many, always susceptible to the suggestion of the demagogue, than might reasonably be expected under an autonomous form of local self-government lacking in checks and balances. In times of popular excitement, the promptings of reason and justice are often unheeded.

Since the establishment of the Proprietary Government under Penn's Charter, Pennsylvania has, for administrative purposes, been divided into districts known as counties. The Constitution of 1874 recognizes this arrangement, and imposes important restrictions on the power of the general assembly to meddle with it. To the inhabitants of these geographical areas certain governmental functions have from time to time been committed. In order to facilitate the performance of those duties, they are recognized as corporations, with authority to sue and be sued under a corporate title, viz., the names of their respective counties. Since 1724, their corporate powers have been exercised by officials known as commissioners, who are elected by the voters of the county. As compared with the part played in the public business by the other counties of the Commonwealth, that of the County of Philadelphia has, for a reason about to be mentioned, been much curtailed; but the county organization of the inhabitants of Philadelphia still exists and cannot be done away with until an amendment of the Constitution shall authorize its elimination.

For reasons of local interest, advantage and convenience, the people of the territory known as Philadelphia County are also organized as a municipality under the title of The City of Philadelphia. This corporation is now entrusted with, *inter alia*, certain administrative duties performed elsewhere (and formerly here) by the county. Speaking generally, the powers vested in the City are exercised in its name by the Mayor, who is its chief executive officer, and a body of representatives chosen by the electors of the several districts into which its territory is divided, and known as its Council.

In order to secure suitable provision for the education of their children, the inhabitants of Philadelphia are organized as a body corporate, known as the School District of Philadelphia. The public school system of the district is administered by a group of representatives selected by the judges of the Courts of Common Pleas established in Philadelphia, and known as The Board of Public Education.

Such in general outline are the principal agencies through which Philadelphia is governed. To make it possible for these agencies to perform the parts assigned to them in the scheme of local government, the Commonwealth

1 D. & C.

has provided each with the means for obtaining the necessary money. To the school district is entrusted the power of taxation, which, however, is carefully limited, because the members of the Board of Education are not directly responsible to the electors at large. The City of Philadelphia enjoys the right to levy on all things legally taxable rates limited only by the patience of the voters. By the Act of Feb. 2, 1854, P. L. 21, the representatives of the County of Philadelphia were deprived of the right to raise money directly by taxation; but their requirements for the fulfillment of duties imposed on them by law must be supplied by the City, whose authorities may be compelled by mandamus to raise and appropriate in advance whatever sums shall be needed to carry on such public business.

These three public corporations stand in much the same relation to each other as would a church corporation, a benevolent society and a neighborhood social club, the members of each of which happened to be the same individuals. Unfortunately, however, their independence of each other has sometimes been forgotten, and this has tended to produce confusion. Thus, the so-called City Treasurer is in fact the treasurer of the county (Com. v. Oellers, 140 Pa. 457), but was, nevertheless, made by Act of June 1, 1885, P. L. 37, 44, head of a city department, and the Board of Public Education is required to elect him treasurer of the school district. The City Controller, although a county officer (see Taggart v. Com., 102 Pa. 354), is in like manner placed at the head of another department of the City administration, and he is annually elected controller of the school district. It has been solemnly ordained by the legislative branch of the City government that the City Commissioners (who, in spite of their official title, are county officers) shall, in addition to various specified duties, "perform such others as councils may from time to time prescribe."

Notwithstanding such confusion of thought on the subject and the resulting anomalies, the three corporations above mentioned are separate and distinct agencies or instrumentalities of government, and the Commonwealth (as represented by the general assembly, which is, of course, subject to the limitations imposed upon it by the Constitution) may make use of whichever of them it selects to effect any particular purpose.

In this connection, it is important also to refer to another subject about which there is widespread misconception. The courts through which, in Pennsylvania, justice is administered are local only so far as concerns their jurisdiction. The Courts of Common Pleas, the Court of Oyer and Terminer and General Jail Delivery and the Court of Quarter Sessions of the Peace of the County of Philadelphia, for example, are not in any sense the judicial agents of the county, although they are sometimes called on to participate in the administration of county business. Nor is the Municipal Court of Philadelphia the City of Philadelphia in its judicial aspect, as is popularly believed. They are all the courts of the Commonwealth, notwithstanding the fact that their judges are chosen by the electors of a district whose boundaries happen to coincide with those of the city and county. The salaries of these judges are paid from the State treasury, and the duty of providing suitable places for their sessions rests primarily on the Commonwealth.

For three generations, at least, the State has delegated the function last mentioned to the several counties. By the Act of April 15, 1834, P. L. 537, which codified the law in relation to counties and townships, it was provided that it should be lawful for the commissioners of any county, having first obtained the approbation of two successive grand juries and of the Court of Quarter Sessions of such county, to cause to be erected at the seat of justice thereof, when occasion shall require, such building or buildings as may be

necessary for the accommodation of the courts and of the several officers of the county. The Act of April 19, 1895, P. L. 38, recognized as well established the usage of committing to the County Commissioners the work of constructing such buildings, as had also the Act of April 24, 1879, P. L. 32.

In the case before us, it is contended on behalf of the plaintiffs that the court-house for which the Council of the City of Philadelphia has appropriated the money whose payment they ask to have restrained is a public building, and our attention is directed to the Act of June 1, 1885, P. L. 42, and to the Act of June 25, 1919, P. L. 581, as indicating by what public officials such buildings must be constructed.

By the act first mentioned it is provided (see section 1 of art. IV) that the construction, protection and repair of public buildings and structures of every kind for public use shall be under the direction, control and administration of the Department of Public Works of the City.

By the latter act it is provided, in section 3 of art. VI, that the Department of Public Works of the City shall have the construction, protection, maintenance, operation and repair of public buildings, bridges and structures of every kind of public use. In the 8th section of art. II it declares that it shall be the duty of the City Architect to prepare, draft and execute, or to supervise the preparation, drafting and execution of all specifications, drawings and plans for public buildings to be erected in the City and to be paid for by moneys appropriated by the City Council, except in cases where, on account of the magnitude or character of the work to be done, special architects are necessary in the joint opinion of the head of the department under the jurisdiction of which the work is to be done and of the City Architect, in which case such special architects shall be appointed by the City Architect with the approval of the Mayor, either in their discretion or after such competition as they may choose to arrange.

That the proposed court-house is a public building cannot be gainsaid. The great question in the case is whether or not it is such a public building as is referred to in the two acts above cited.

It is quite obvious that, in spite of the breadth of the language employed in them, these statutes do not refer to all public buildings. Manifestly, Federal custom-houses and post-office buildings and such State buildings as penitentiaries could not fall within either the category of "public buildings and structures of every kind for public use," or that of "public buildings and structures of every kind of public use." These words, therefore, are not *nomina generalissima*. Their meaning is limited. · To what sense are they restricted?

The answer to this question, we think, may be inferred from the subject-matter of the two statutes. The Act of June 1, 1885, P. L. 37, is entitled "An act to provide for the better government of cities of the first class in this Commonwealth." The Act of June 25, 1919, P. L. 581, is entitled "An act for the better government of cities of the first class of this Commonwealth." The title of an act is part of it; it limits its scope, and is properly used in interpreting its words: Perkins v. Philadelphia, 156 Pa. 554. Both acts, therefore, relate to cities. The duties and powers to which they refer are those of a municipality in the strict sense of that term. The public works which they regulate are those within the ordinary scope of city administration. Neither act hints at the subject of the control of matters not ordinarily delegated to city authorities.

It may well be that in this era, when population tends so strongly toward concentration in towns, other cities besides Philadelphia may reach the first

class of cities as defined by law without becoming coterminous in area with the counties in which they lie. It could not be inferred from anything in either of the two acts under consideration that such a city was intended to oust its county from the prossession or control of the county buildings, or be burdened by their care and maintenance. But if that meaning could not be imputed to these statutes in such a case, they are not to be so construed when applied to Philadelphia.

It has never heretofore been thought that the Commonwealth was precluded by the Act of June 1, 1885, from constructing by the hands of its own agents whatever public buildings it saw fit to erect within the limits of Philadelphia. By the Act of July 2, 1901, P. L. 601, provision was made for the establishment in every city of the first and second class of a house of detention for the reception of untried juvenile offenders, which was to be provided by a board of managers appointed by the Court of Oyer and Terminer and General Jail Delivery and the Court of Quarter Sessions of the Peace having jurisdiction in such city, and paid for by the county commissioners of the county containing the city for which such board of managers might be appointed. By the Act of April 3, 1903, P. L. 137, the county commissioners in each county of the Commonwealth were required to provide in their county a separate room or rooms or a suitable building to be used exclusively for the confinement of children under sixteen years of age in custody awaiting trial or hearing. The City Commissioners have acted under each of these statutes, and in neither instance has objection been advanced on the part of any one.

We are clearly of opinion that neither of the statutes on which the plaintiffs base their contention that the building intended for the use of the Municipal Court of Philadelphia must be erected under the management and control of the City's Department of Public Works applies to buildings other than those intended for strictly City use, and that, therefore, the plans for the proposed court-house (which is not for municipal use) need not be designed by the City Architect or an architect specially appointed by him with the approval of the Mayor, or built under the direction of the department just mentioned.

The duty of constructing the court-house in contemplation is imposed specifically on the County Commissioners of the County of Philadelphia by the Act approved July 12, 1913, P. L. 711, entitled "An act establishing a court for the County of Philadelphia; prescribing its jurisdiction and powers; providing for the service of its writs, process or warrants by the proper officers of the County or City of Philadelphia; regulating the procedure therein and appeals therefrom, and providing for the expenses thereof." The second clause of section 3 of that statute reads: "It shall be the duty of the County Commissioners or other proper officers of the said county to provide proper accommodations for the holding of the said court at such times and places as the said court may decide, and the expenses of the same shall be defrayed out of the treasury of the County of Philadelphia." This provision is in strict accord with the traditional custom of the Commonwealth in such matters. It is hardly necessary to point out that the words "or other proper officers" are redundant, since there are no other county officials available for such duty except the commissioners.

On behalf of the plaintiffs, it is argued that the provision just quoted from the act, establishing the Municipal Court of Philadelphia, was, in effect, repealed by the Act of June 25, 1919, P. L. 581, and that the duty of providing proper accommodations for that court was thereby shifted to the City's Department of Public Works. This is supposed to be effected by the general

language of section 3 of art. VI of the latter statute, which is quoted above. To impute such an effect to that section is, in our opinion, however, erroneous; for, as already pointed out, the Act of June 25, 1919, refers only to cities and what is ordinarily municipal business, and in that the construction of court-houses has never been included. Moreover, to read into the statute such an intendment would make it offend against section 3, art. III, of the Constitution, for its title fails to give notice of any such a purpose on the part of the legislature. It is, as was noted above, entitled "An act for the better government of cities of the first class of the Commonwealth of Pennsylvania."

It has been suggested at bar, although not set up in the bill, that the action of the City Commissioners in engaging Mr. Windrim as architect to prepare plans for the proposed court-house is illegal, because the approbation of two successive grand juries and of the Court of Quarter Sessions of this county have not been obtained, which are required as a condition precedent to their authority for the erection of such a building by section 10 of the Act of April 15, 1834, P. L. 539. It is, we think, a sufficient answer to this objection to point out that the authority to build the court-house under consideration is directly conferred on the commissioners by the special Act of July 12, 1913, P. L. 711, and that it is, therefore, unnecessary to resort to the procedure to obtain it that is provided for by the general Act of 1834.

Our attention has also been directed to the Act of April 19, 1895, P. L. 38, the 1st section of which reads as follows: "Whenever the commissioners of any county are authorized and required to erect a court-house, jail or other county building, they shall submit the plans and specifications adopted by them to the judges of the Court of Common Pleas of the proper county for their approval, and, when it is obtained, they shall let the work by contract to the lowest and best bidder, after three weeks' public notice in two newspapers published in the county, which contract or contracts shall be made subject to the approval of the said judges."

It is urged by counsel for the plaintiffs that, if the Act of July 12, 1913, P. L. 711, conferred on the City Commissioners the power to erect the proposed court-house, the earlier act (just quoted) prescribes the manner in which that power shall be exercised. In this view we agree. In our opinion, the City Commissioners, before entering into a contract for the construction of the building, must submit for approval to the judges of the Courts of Common Pleas of this county the plans and specifications which may have been adopted for it, and, after advertising for bids on the work and awarding the contract to the lowest and best bidder, submit the contract for approval to the same judges. Since, however, this act requires that the plans and specifications must be submitted to the judges, it follows that such plans and specifications must first be prepared, and that the employment of an architect to prepare them for submission is proper and, in fact, absolutely necessary.

It seems to us to be quite clear that the contract made by the City Commissioners with the defendant, John T. Windrim, is lawful and that, so far as it provides for the preparation of plans for the building for the Municipal Court, the appropriation made by the Council of the City of Philadelphia is not illegal.

Inasmuch as the bill fails to aver an intention on the part of the City Commissioners to disregard any requirement of law, except so far as relates to the Acts of June 1, 1885, P. L. 37, and June 25, 1919, P. L. 581 (neither of which is, in our opinion, binding upon them), we have no right to assume that it is their purpose to enter into a contract or contracts for the building of the proposed court-house without fully complying with the Act of April 19,

1 D. & C.

1895. It will be time enough to invoke the aid of the court when an attempt is made to bind the county by executing a contract for the construction of the building in disobedience of the statute last mentioned.

We can see nothing improper as yet in any of the appropriations of money made by the City Council for the work of building, assuming, as we must, that they were made in anticipation that a proper contract will be made therefor in manner provided by law.

We hold that under the law the plaintiffs' averments do not entitle them to the decree for which they pray; and from this it follows that their bill must be dismissed at their cost, so far as concerns the demurrants.